Your Honors, may I reserve three minutes for rebuttal? Yeah, just one minute while we get everybody set up here. All right, we're ready? Okay, go ahead. Thank you. May I reserve three minutes for rebuttal? Sure, of course. May it please the Court, my name is Jeff Little. I am the attorney for Anthony Miele, III. And we're here to argue that the Court below erred in both applying the standard for summary judgment and in determining facts in a manner that was least favorable in the light of the non-moving party and most favorable in light of the moving party. And the opinion is a very tight opinion in the sense that there's a number of things that are rejected out of hand. But the salient facts, for your honor, are these. The UCC was enacted to eliminate this kind of litigation. It set forth obligations and put obligations on those parties that were best able to bear those obligations. And what the judge did below by applying a standard of notice that does not exist in the UCC was to go outside of the UCC and shift that burden to Mr. Miele versus the clear obligations of the transfer agents of Franklin Resources and of Franklin Resources itself. So briefly, this story starts in 1971 at the time that Franklin Resources becomes a public company. It enters into an agreement with the Bank of New York in which three parties, Mr. Mulvihill's company that did the IPO, Franklin Resources, and the Bank of New York, all agree to maintain the records of every single share transfer and to maintain copies of every single canceled share. This is not uncommon. This is the way the system is. And transfer agents exist to maintain these mounds of data, but so do the public companies themselves. Indeed, in the bylaws of Franklin Resources, the corporate secretary is required to maintain precisely those records without time limitation whatsoever. In 1973, Mr. Miele Jr., my client is a little over two years old, buys stock to be held in trust for Mr. Miele III, the plaintiff here. The next he hears about this stock is 2012, when the chairman and chief executive officer of Franklin, who had personally sold the original shares in question to Mr. Miele Jr., calls and elevates an issue as to did you ever get the shares, a reference to some events that took place according to Mr. Johnson in 1986. Mr. Miele Jr. died when my client was three. My client never knew anything about it, never received any mail, although there were references to mail during some time period. I'm sorry. Did he have that conversation before he got the letter from the IRS? No, he did not. Okay. He got the letter from the IRS first. He got a notice of proposed changes to your 1989 tax return. Correct. Okay. Right. And on it, it's three pages, or let's see how many pages. I think that's about three pages, and it says, well, what I've highlighted here on the first page, you will owe us $19,066. Please compare your records with the payer information shown on page three of this notice. And then you go to page three of the notice, and it has the Franklin Resources of the Bank of New York stock information here, issued form 1099 dividends, and it looks like it's $41,000 worth of stock, if I'm reading this correctly. Correct. All of that is correct. So he got this, right? He got it. And I think the record is clear that he saw the big print on the front saying that he owed the money. He was 19 or 20 at the time. I thought he was 21. Maybe 21 at the time. But what's your position is that that's not sufficient notice under the Delaware statute? Correct. Why isn't it? Because it's not, as we say in our brief, it's not notice of it. Not notice of what? It. And it, in the statute, is notice that the certificate has been lost, destroyed, or wrongfully taken. All this is, at most, is a notice that stock was, in 1989, in the name of Franklin Resources, was owned. He did nothing with it other than to take it to an accountant who wasn't his, Mr. Mulvihill's accountant, no less. He had two two-minute conversations with him. The guy said, pay him. It's the IRS. And although there's a dispute and recollections at this point in time, the accountant said, you don't want to tangle with the IRS if you have the money. So the affirmative defense is that he did get notice, shouldn't have waited. I'm sorry? The affirmative defense is that he did get notice, correct? Right. But he didn't get notice. And so then we look at the definition of notice under this Delaware statute, and it says a person has notice of a fact if the person has actual knowledge of it, has received a notice or notification of it, or number three, which I think is what we're all looking at, is from all the facts and circumstances known to the person at the time in question has reason to know that it exists. Yes. And you're saying it is what here? Well, it, the fact, notice of the fact, which then they refer to it as it, is what's found in 8405 and 8406. Which is? Well, 8405 is the Delaware statute on the replacement of lost, destroyed, or wrongfully taken securities. And 8406 is the provision of the code under which the defendant is claiming that notice precludes the 8405 remedies. Well, he got notice from the IRS that he owed, I don't know, taxes and penalties on how many thousand shares of Franklin, whatever it was. I don't think it, I don't think, I don't remember the notice telling you how many shares or any of that information. The size of the dividend. Size of the dividend, I think. $40,000. Approximately $40,000. So he never paid taxes on $40,000 of dividends on Franklin's stock. He never received $40,000 of dividends. He didn't receive any of the dividends. He got notice that somebody reported that he was paid $40,000 in dividends. Correct. On Franklin's stock. And he never paid tax on it. So doesn't that give him, and I guess his reaction was, well, I don't have those certificates. And then what? They must be lost. Is that right? Is that his reaction? Something like that? No. I've never heard of these shares before. Not exactly, no. Well, what's his reaction when he gets them? The reaction was, it's a six-page notice, maybe on the third page, I think, is the mention of Franklin. On page three of the IRS? Yeah. I'm sorry. I thought that's what I had said. But on page three is the reference to Franklin. On page one is the reference to how much he owes. The mail went to his mother's house. His mother called him up. He was in college. Said, I have mail for you. He came by, picked it up, opened it up, and as he testified, he read the first page or the first portion of the first page. I will just say that he's a relatively unsophisticated guy. And then he eventually called an accountant, right? No. He then immediately said to his mother, what should we do about this? And she said, let's call Mr. Mulvihill, who I think they referred to generally as Uncle Gene at the time because he had been a very close business colleague of Mealy Jr. And her statement was, he knows about these things. And he went to see him, showed him the notice. He said, I'll take care of this. I want you to talk to my accountant, Elliot Goldberg, and got the notice to Mr. Goldberg, and they had two two-minute conversations after that. He talked to Goldberg, the accountant? He did. And Goldberg told him, well, just pay it? Goldberg told him, just pay it. And he said, okay, I'll pay it. He said to him, well, he didn't say just pay it. He said, if you have the money, pay it, because the IRS is like a legalized mafia and you don't want to get in trouble with them. Right. So he paid it. He paid it. And he had the money. And he made no further inquiry. He made no further inquiry. And your position is, well, that was completely reasonable on his part. He never cared what happened, you know, whether Franklin shares were or anything like that. Is that right? Yeah. I don't even think that there was a conversation about Franklin shares. Whether there was a conversation or not, he knew he was paying taxes on these $40,000 of dividends. He had never seen the stock. The accountant says, pay it. And he paid it. He forgot about the whole thing? Well, Franklin wasn't the only company as to which there were dividends that were on that that weren't paid. So just for clarification. What are you saying? He was confused? No, I'm saying that he. He had so much stock he didn't care about Franklin. He didn't have. The stock, huh? No, he didn't have an obligation to seek to find the stock. It's not an obligation. The question is, you know, would that put a reasonable person on notice that you should make some further inquiry? Not according to the UCC. Article 1, Section 202 defines notice very carefully. And as at least one member of the panel has stated in a prior opinion, the UCC is self-contained with regard to what it does and doesn't contain. This particular section, 8405, that we're talking about, has no statute of limitations associated with it. So Article 1202 says that a person has notice of a fact if the person has, as was read earlier, has actual notice of it, has received a notice or notification of it, or from all the facts and circumstances known to the person at the time in question has reason to know that it exists. That's a classic formulation. That's what she just, Judge McGill, just read to you. Yes. And that's a classic formulation. And under the Part 3, isn't that what they call it? That's really just inquiry notice. No, that's not. That's constructive. That's constructive notice. It doesn't require any obligation. Even if it's constructive notice. Well, then even if it's constructive notice. Let's talk about it. Even if that's constructive notice, I guess that's my main question for you, because I'm just trying to figure out why wouldn't this 1992 IRS letter be sufficient under that standard as well, because it appears the letter informed Mr. Mill that Franklin's stock was registered in his name. Someone was receiving significant dividend payments on the stock. But Mill wasn't receiving the payments. I guess it isn't. Nobody received the payments. If I could just finish my question. I'm sorry. If this isn't enough for a reasonable person to infer that he owns stock, but the stock is somewhere lost or gone, I mean, I'm just trying to figure out why wouldn't that fit under even constructive notice? Because the notice is notice of a fact. And the facts that are relevant are not that you own the stock or that there have been dividends credited to you. The facts that are relevant here are whether or not the certificate has been lost, destroyed, or wrongfully taken. There's a case cited in the paper somewhere called Gallagher, which was a California case many years ago, pre-code, I believe. And they were talking about, the Supreme Court of California was talking about the issue of how long a time period could be applied, back pre-code, thinking maybe laches was the issue. And they say, the court said that a woman who knew that her stock certificates had been destroyed in a fire and didn't ask the company about it for 28 years had not been unreasonable in waiting to do this. And the reason for that and the difference here between the question that you're positing is that what he didn't know was that it was wrongfully, that the shares were wrongfully taken. The whole claim is that the shares are wrongfully taken and there is a ‑‑ It seems like all he had to know was they were gone or that he didn't have them. I mean, I'm trying to figure out where is it ‑‑ what's your authority? Is it that case that says he has to know they were wrongfully taken? The statute, 8405 and 8406, the two statutes reflect that this is for the situation where the stock is wrongfully taken or lost or destroyed. Or lost. Or lost, right. So it's hard to lose something you didn't know you have. And it turned out that when he was finally called in 2012 by Mr. Johnson, that Mr. Johnson was concerned because he didn't know what happened to the stock. And he was concerned that he had never gotten a call thanking him for this. And, in fact, we didn't know, none of us knew, that the stock had disappeared from the vaults at the Bank of New York, the transfer agent, until 2014, when Maria Gray, the corporate secretary, finally sent us the desk file or some pages of the desk file of the General Counsel. Pardon? It's also possible these shares may have been sold on his behalf, right, and he was given the proceeds. Is that a possibility? If they were sold on his behalf, that was an illegal act because these shares were Regardless of whether it's illegal or not, I mean, didn't he receive, I forget, Uncle Gene gave him millions of dollars. I mean, he gave him millions of dollars. It's clear that the wrongful sale is part and parcel of a wrongful taking. In other words, there were nine documents that were required. These shares were denominated as being in trust. And the sales required the trust agreement. It required all sorts of things. We don't know if there was a sale on his behalf. All we know is that these shares disappeared from the vaults. And all we know is that Mr. Mulvihill sold some shares in Franklin Resources. We don't know what the source was that he got them. And we don't know what he did with them. And the shares don't add up. They're over 50,000 shares difference, which today would be somewhere on the order, I'm going to say, of about 850,000 shares difference. Thank you. Did you want to – well, you're out of time, but I'll maybe give you a minute or two. Thank you. Thank you very much. Good morning. My name is Mark Mulumphy, and I'm representing the defendant and the appellee, Franklin Resources, in this case. There's been a large record presented to your honors to consider for summary judgment. And I think your questions focused on the salient issue, the salient time period. But this is a difficult case, I have to say, because we're looking at this clause in this particular Delaware statute that, you know, Delaware hasn't given us a lot of guidance on in this context, but it has commented on it in various other contexts, some of it that supports your position, some of it that doesn't. And so I'm just trying to figure out, you know, which way and which application. Do we go with what the magistrate judge did, who did a pretty meticulous job of going through different review of this case and the law, and I think ended up applying in Dean or looking at in re Dean Whittier and other cases regarding the tolling of the statute of limitations. But it seems like that case might be distinguishable because it, you know, here, I mean, I think it was equitable remedy that they were talking about in Dean Whittier and not at the statutory language. So please help me try to resolve this. Sure. And you're absolutely right. There is not a law in Delaware or in other states applying what is proper notice. However, I think we all can agree on it is in the statute, and whether it's actual notice or reason to no notice, this constructive notice principle, Mr. Mealy had that notice. Before we go right into that, if you could respond, as you respond to that question, to Mr. Little's statement that he had to have noticed it was wrongfully taken. So talk to me about that. That's simply incorrect. And the statute is 8406. That is one avenue in which a shareholder can provide notice. But 8406 says the it is if a security certificate has been lost, apparently destroyed, or wrongfully taken, and the owner fails to notify the issuer of that fact. So that fact is that the certificate has been lost, destroyed, or taken. So wrongfully taken, yes, that is one possible avenue for a shareholder to give notice to an issuer. But that's not the only one, and that's, I think, clear in the statute. In this case, Mr. Mealy had notice that his security had been lost, and the IRS notice provides it. We're going to say lost because the IRS notice attributed ownership of the shares to him, right? Correct. And he didn't have them. So that means they're lost? Yes, absolutely. Or it could have been, or maybe, you know, maybe it was stolen. Well, either way, he did not have them, and I think that's what Judge Buehler was going on. His whole theory of this case, Your Honor, remember, is I never knew I had Franklin stock until 2012. We found this IRS notice through discovery, and we presented it to him, and he said, I only read, he didn't read the first half of the page, he read the first two lines was his testimony. And he freaked out and called in an accountant. Well, coincidentally, the next page or page 3 talks about Franklin shares. But the reason to know standard is an objective, excuse me, reasonable person standard. So whether or not he read the entire document is not the question. It's what a reasonable person would decide. You're talking about constructive notice. Right. And I think all parties agree under the third prong of notice, that's constructive notice. But is it? Let's look at that. It says from all the facts and circumstances known to the person at the time in question has reason to know that it exists. I mean, it's almost inserting a little bit of a subjective element to it or not. It's not as subjective. It is a reasonable person standard. And I think the case law, including the cases they cite, for example, the Weller case, which is the one Delaware case, the Ibanez case, which is the California case, pretty much every court that has looked at that prong has applied a constructive notice standard. Otherwise, why would you have a difference between an actual notice, but the person knew, and a reason to know notice? It has to be a constructive notice standard. Otherwise, it would make the actual notice standard repetitive, redundant. So why do you think Weller is the 94-year-old woman case? It is. And why is that different? So our position is Weller is probably the most opposite case to the situation you have here. You have a 90-year-old woman who is mentally and physically infirm that's taken in by a couple who she knows and trusts who take care of her. While they're under care, she breaks her hip. They start opening her mail, and they discover these dividends, which they deposited into their account. The Delaware court in that case rightfully said she did not have a reasonable basis for discovering, by looking at her account statements, for example, that funds were missing. That was the basis for the decision in Weller. Contrast that to, for example, the Hovey case, where someone knew they had shares, but in a quarterly statement that they received, some of those shares were missing. That was a suspicious circumstance by which the court said that's a trigger. That's the type of situation you typically have here. This case isn't anywhere like Heller. We have a 21-year-old adult running his own business in college, and he admits that he received the IRS notice, an IRS notice that says on its face at page three, Franklin Shares. Your Honor asks about $41,000, and I think the response was that was $41,000 worth of shares. It's actually 41,000 in dividends, which equate to 140,000 shares. His income that year was 20-something thousand. You mean his reported income? His reported income. That's right. So even on that basis, it's twice, 140% of his income. The dividends, he said, well, there are other dividends in there. Well, look at the notice. There was one other company, GE, that had $75 in dividends. The other one, Franklin, $41,250 in dividends. No reasonable person taking a look at this notice, receiving it in the mail, freaking out, would then say, you know what? I'm just going to pay it. I'm not going to read it. I'm just going to pay it. As implausible as his story is that I didn't read it, as implausible as his story is that his accountant told him to just pay it, Judge Buehler assumed all that to be true for purposes of summary judgment. She held that the IRS notice under a reasonable person standard still put a person on notice that they own Franklin Shares. And since the theory is I never owned it, if you're being told you do own it and you've never seen it before, that's a loss. But did Judge Buehler apply constructive notice? I thought she did the reasonable inquiry notice. She did both. She did in two steps. So she first said that there was constructive notice as to what a reasonable person, but then she took it the next step and said, because this was so suspicious, an inquiry would have led to additional facts. So all the additional facts, such as the fact that his uncle Gene had all these Franklin Shares suddenly in his account, which he liquidated, the C-Board applications that have Mr. Mealy's signature during the same period, which he says are forged, all these additional records were then kind of opened up. But, I mean, aren't there two different kinds of notice, a reasonable inquiry notice and a constructive notice? Or are you saying that's one and the same because then I'm not – well, let me have you answer that question. It's a good question. I would say constructive notice is a spectrum, and the reasonable inquiry is at the end of the spectrum. But the constructive notice is simply an artificial – you're charged with notice based upon what a reasonable person would have based upon the same information. Inquiry notice is what you have leads you to go one step further and ask. So in this case, asking Franklin, giving them a call and saying, as Your Honor had asked, I don't own these shares. What are these shares? Why am I being reported to having these dividends? That's inquiry notice. Under either standard, under just a straight constructive notice where they don't take that extra step and make that phone call from the facts and  is established in this case. I wanted to – Let me ask a question. This is a minor point, but I think the plaintiff's position in his brief is that 8406 doesn't apply because of the provision that says, and the issuer registers a transfer of the security before receiving notification, because, you know, it's impossible to comply with that because, what, there was a transfer before he even had notice. So 406 doesn't apply. Isn't that the plaintiff's position? That is his position. What's your response to that? Well, number one, like the inquiry notice argument, this argument was not raised below. It's raised for the first time here. It's completely inconsistent with the text of the statute. The statute language says, quote, and the issuer registers a transfer of the security before receiving notification. So the language itself, the plain meaning of that language is that section 8406 applies where the issuer has registered a transfer before receiving notification. There's no additional requirement or limitation, such as the owner receiving notice before the transfer takes place. Now, certainly it would be nice if notification was received by the issuer before the transfer was registered. That would give them the ability to stop it. But that's not a requirement or a limitation on this defense. And as we cited, the Weller case, the Hovey case, the Burke case, all those cases involved situations where the notification was given to the shareholder of the loss after the transfer had taken place. And they still all applied this statute. So the court's interpreting have never, and no court has ever adopted the position that Mr. Mealy is advocating here. And from a practical point of view, as we pointed out, it would lead to an absurd result in the situation where a shareholder, like Mr. Mealy, after learning of a loss, but after a transfer occurs, let's say he learned of it a could just sit on their rights for as long as they wanted to and still have a cause of action and prevent an issuer from invoking that defense. That's contrary to the purpose of 8406, which is supposed to give an issuer the ability to either stop the transfer or, if the transfer's already taken place, to investigate it so they can remedy the situation by either defending themselves or going after the person who got the money. Here, because he waited 20-plus years, Mr. Mulvihill died. His estate was closed. His brokerage account in which he was trading these Franklin shares was closed. All this type of information that would be available to Franklin to defend this type of case is gone. And that's also a basis for the latches argument, which we briefed in our papers. Could we be sure that Delaware would apply latches to this provision or to these 80405 claims? It seems like there are factual disputes here as to the reasons for the delay in bringing the suit, and the district court didn't really address the latches. I'm not sure if you want to talk about any of that. I appreciate that, Your Honor. So on the issue of the unreasonable delay for purposes of latches, there is no dispute that inquiry notice does apply for latches. So if one assumes, as Judge Bieler reasoned in her opinion, that he had picked up the phone call and figured out the shares are gone and been able to trace it like we were able to do in discovery back in 1992, he didn't bring the case until 2012, 20 years. So that 20 years is an unreasonable delay, and I don't think there can be any dispute about that. We know, for example, in the two cases that were cited by the plaintiff, the Kraft case and the Weller case, the Kraft case was a perfect situation in which a court, because of the death of a key witness, one key witness, that was enough for prejudice in taking too long. The key case in Delaware on latches is Church of Religious Science. That's another case, on summary judgment, in which a plaintiff had waited a couple years too long, and in the meantime the plaintiff had exploited a technology that he had developed and started a new business. The key witness had passed away, and the court found on summary judgment grounds that that was, as a matter of law, unreasonable. We think the same situation, we think this is a prototypical situation for application of latches. All right. Thank you very much. Thank you. Well, as complicated as the situation was with Mr. Mulvihill. Hold on. He needs to be given just at the most two minutes, please. Sorry. As complicated as the situation was with Mr. Mulvihill, he did not die before this came to the floor in 2012. In fact, he may have died and had a heart attack, massive heart attack, because this came to the floor in 2012. When Mr. Johnson contacted Mr. Mealy through his friend, who he had been on the NASD board with, Mr. Mealy heard for the first time that Mr. Mulvihill had been put into this situation. He heard for the first time, and this is why it was so striking to him, that his father had actually left something for him. He spent his entire life with his family not talking about his father, not knowing anything about his father, and he went to confront Mulvihill about it and confronted him about it. Within a week, Mulvihill flew to Nantucket to meet with Mr. Johnson, and they had an argument on Mr. Johnson's front porch for an hour. And then Mr. Mulvihill, who was apparently the only summer tourist that year, who showed up in Nantucket in wingtips and a three-piece suit, flew back to New Jersey after the argument on the front porch. Mr. Johnson then worked with Mr. Mealy and with counsel and with investigators to try to get to the bottom of it, and it wasn't until 2014 that anybody learned that the shares, which had not been returned because they had not been deliverable, that the shares had left the vaults of the Bank of New York, the transfer agent. And that's the exact word in the letter. And first of all, they were kept in the vaults. And secondly, in October of 1991, Mr. Hanrahan, who was the liaison between the Bank of New York, worked for the Bank of New York and Franklin, left a telephone message that is in the record saying, what happened to the shares, to Mr. Burns, the then corporate counsel and corporate secretary. I do want to just address one thing, if I can, and that is that the issue that you focus on with regard to, is inquiry notice part of constructive notice? Obviously, the big issue there is inquiry notice requires you to do something. You have to affirmatively go out and search or investigate. And there is a situation under the notice provision of the UCC, Article 1-202. And I commend it to your review, but it's subsection F. And it imposes a duty on organizations, specifically not on individuals, on organizations, to conduct some due diligence if they get an inquiry about a missing stock or anything else that this notice article and definition applies to within the UCC. I think Judge Shotney has a question. I'm sorry. Very briefly, you contend that the judge erred in granting summary judgment. Reference was made to the extensive record. Am I right that the alternative would have been a bench trial? Yes. Before this judge? Yes. And what would have been different? What would a trial look like in a case like this? She disputed the veracity, whether she disclaims it or not, of Mr. Mealy and his mother and Passanante, all of the people who could have been in a position to know about Mealy. In fact, the prior time we were in court, she said, I think I want to get those people in here for a trial, even if it's a mini trial, so that I can assess what they did. So your claim is that if she had an opportunity to listen to their live testimony and resolved credibility issues favorable to them, she would have come to a different bottom line conclusion? Right. She says that she doesn't address credibility in it, but she has to because the denials of the actual live witnesses are so extensive and so all-consuming throughout the entire time period. So she would have had to have at least seen them. Thank you. Thank you. Thank you very much. Thank you both for your oral argument presentations today. The case of Anthony Mealy III v. Franklin Resources, Incorporated and Charles B. Johnson is submitted. Thank you.
judges: Tashima, Murguia, Chatigny